IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

MICHAEL HOLLOMAN, JR., }
}
    Plaintiff, }   CIVIL ACTION NO.
}
v. }   00-AR-1855-J
}
WALKER COUNTY BOARD OF }
EDUCATION, }
}
    Defendant. }
}

**MEMORANDUM OPINION**

    The final judgment entered on June 4, 2001, in favor of defendants, George Harland and Fawn Allred, who, respectively, were the principal and teacher of plaintiff, Michael Holloman, Jr., has been appealed by Holloman to the Eleventh Circuit. Now before the court are cross-motions for summary judgment, one by Holloman and the other by the sole remaining defendant, Walker County Board of Education.

    It is difficult to know what Holloman is counting on as a basis, or as bases, for obtaining relief against the Board. The pre-trial order drafted by Holloman's counsel, and entered by the court on May 30, 2001, contains the following language describing Holloman's claims:

> (1) Agreed Summary - The case arises out of two separate situations occurring during the minor child of Plaintiff's tenure as a student at Parrish High School, a school operated by the Defendant Walker County Board of Education. Defendant Harland was Principal of Parrish High School while Plaintiff's minor child was a student, and Defendant Allred was Plaintiff's minor's First Block teacher during his senior year, the 1999-2000 school



>      year.
>
> (2) Plaintiff's Positions
>
>      Plaintiff alleges that his minor's punishment was not for making a demonstrative gesture during the time set aside for the recitation of the Pledge of Allegiance, but, instead, that he was punished for his refusal to recite said Pledge, and that said punishment was therefore in violation of his rights under the First and Fourteenth Amendments to the United States Constitution, guaranteeing Freedom of Speech. Plaintiff seeks damages, as well as attorney fees, under § 1983 for the alleged violation of his minor's constitutional rights.
>
>      Plaintiff further alleges that his minor's rights were violated by the solicitation of prayer request by Defendant Allred, by being subjected to the offering of prayer requests by students, by Bible reading in class and by Defendant Allred leading prayer in class by saying "let us pray" prior to the moment of silence and the word "amen" at the conclusion of the moment of silence.

Rule 16(e) F.R.Civ.P., provides that the pre-trial order "shall control the subsequent course of the action". In other words, what is left out of the pre-trial order is left out of the case, unless reintroduced by subsequent special order for good cause shown. The above-quoted order does not contain any allegation or theory upon which §1983 relief could be obtained **against the Board**. The individuals, Allred and Harland, whose conduct Holloman complains of in his statement of positions, cannot form a bridge upon which a local governmental employer can be reached, unless crucial facts that are absent from the pre-trial order are somehow introduced.

This fatal shortcoming in the pre-trial order, in which plaintiff seemingly relies only upon *respondeat superior*, must be overlooked *arguendo* if this court is to seriously consider Holloman's motion for summary judgment against the Board.

This court feels especially qualified to rule upon the Establishment Clause issue in this case. This court got ahead of the learning curve by anticipating how politically correct it would eventually become to erect and to strictly maintain Jefferson's "Wall of Separation" between Church and State. On August 20, 1990, this court had never heard the term "politically correct", and yet there was already much judicial jousting about how to prohibit religion from invading the public domain. Attached as an Appendix to this opinion is a copy of this court's special order entered on August 22, 1990. If it doesn't qualify this court to speak on what can and what cannot be said and done by teachers and students in the public schools of this country, nothing does. It was certainly not what he learned in law school. If there is the slightest religious connotation in anything that occurs in a public place, this court is prepared to walk on eggshells with all involved.

The dispositive facts in this case are not in dispute. The core facts have already been outlined in this court's earlier opinion. That opinion, however, focused only on the facts upon which this court found Harland and Allred entitled to qualified immunity. The following are additional undisputed facts pertinent

3

to what the court guesses to be Holloman's claims against the Board:

1. The Board has no written policy that requires each and every student to recite the pledge of allegiance. The Board does, however, provide the daily opportunity to all students to recite the pledge. This is in compliance with the requirements of Ala. Code §16-43-5, which reads:

   The State Board of Education shall afford all students attending public kindergarten, primary and secondary schools the opportunity each school day to voluntarily recite the Pledge of Allegiance to the United States flag.

2. Holloman has not notified the Attorney General of Alabama that the constitutionality of Ala. Code §16-43-5 is in question, either directly or indirectly, and the Attorney General has not intervened or otherwise expressed the position of the State of Alabama on the subject.

3. The Board has no written policy that requires, encourages or allows religious observance in a school, although there is admittedly an unwritten policy that calls for a "moment of silence", a concept that has never been expressly defined or elaborated by the Board and has never been found to violate the Establishment Clause. As stated by this court in its earlier opinion now on appeal, Allred misused the "moment of silence" to recognize "prayer" when requested by students, and she

4

occasionally said "amen".

4. There is nothing except Holloman's personal conjecture upon which anyone could conclude that Holloman would have been punished for not reciting the pledge of allegiance if he had not accompanied his silence with a raised clenched fist. His two acts went together. They became one inseparable act.

5. The other original plaintiff, John Michael Hutto, dismissed his action shortly after it was filed. He formally alleged that his reason for refusing to pledge allegiance to the flag was out of a religious conviction that to do so would be idolatrous. Holloman makes no such claim.

6. There was no mechanism by which the Board, acting as a sort of "Big Brother", could observe and react to what teachers and principals did while implementing the Board's directives on a day-to-day and hour-to-hour basis.

7. The Board's student handbook, which contains the Board's official policies and procedures respecting the administration of student discipline, provides, *inter alia*:

It is expected that most grievances will be resolved satisfactorily at this level [teacher or principal]; however, in the event that the grievance cannot be settled by this procedure, then the student, through

5

>   his/her parent(s) or guardian(s), may pursue the grievance to the Superintendent of Schools **and then to the Board.** (emphasis supplied).
>
> 8.  Neither Holloman nor his parents insisted on appealing his grievance or his discipline to the Board, as he had a right to do. Instead, he agreed to accept corporal punishment as a compromise and as a lesser punishment when compared to the proposed denial of his right to attend his graduation exercises.

The easiest issue still in this case (if there are any issues left in view of the absence of any viable allegations against the Board in the pre-trial order) relates to Holloman's demand for punitive damages. A local governmental entity such as the Board is immune from punitive damages under 42 U.S.C. §1983. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S. Ct. 2762 (1981). Therefore, the Board's motion for summary judgment, insofar as it is addressed to Holloman's claim for punitive damages, is clearly due to be granted.

Slightly more difficult is the resolution of the claims contained in Holloman's original complaint (although not in the pre-trial order) for compensatory damages and for injunctive and declaratory relief. From the briefs submitted, it is clear that the parties share an awareness that the Board cannot be vicariously liable under §1983. *Monell v. Department of Social Services*, 436

6

U.S. 658, 98 S. Ct. 2018 (1978). The Board is immune under any *respondeat superior* theory. This court has already, if separately, criticized both plaintiff's drafting of the pre-trial order and the conduct of Allred, Holloman's teacher, when she used the dread words "prayer" and "amen" (although "amen" is often colloquially used as a simple expression of approval and not as the ending for a prayer), but under *Monell* her words cannot be laid at the feet of the Board unless their use was pursuant to or in furtherance of some official Board policy. There is no proof here that the Board had any policy on the subject of how to observe a "moment of silence" or how to preside over the statutorily mandated opportunity to recite the pledge of allegiance. Holloman has been careful not to assert that Ala. Code §16-43-5 is itself unconstitutional, or, that it was unconstitutionally applied, but such intentions may be implicit in Holloman's position. If this is his position, not only does this court disagree with him, but the court respectfully points out that the Attorney General of Alabama is a necessary party when a state statute is being attacked on constitutional grounds.

    Furthermore, there is no proof in this case that the Board delegated to teachers or to principals the final policymaking role so as to pave the way around *Monell* provided by *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S. Ct. 1292 (1986), or *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 St. Ct. 915 (1988).

Finally, Holloman has not pointed to any Alabama statute or judicial decision that makes a teacher or a principal into the official policymaker for the Board, as a matter of law, and thus to meet the standard enunciated in *Jett v. Dallas Independent School District*, 491 U.S. 701, 109 S. Ct. 2702 (1989).

Holloman seems to believe that he has presented evidence from which a reasonable jury could deduce the existence of a Board policy that violates one or more of Holloman's First Amendment rights. The court disagrees. When do the discrete acts of an employee (teacher or principal) ripen into a "policy" of the employer (board of education)? There obviously is a moment at which such a ripening can occur. If an employee does the same unconstitutional thing over and over again, and, while it becomes more and more blatant, the employer does nothing to stop it, it becomes the employer's policy. If Holloman had offered proof that he, or some other student, long before the incident complained of, had brought to the attention of the Board Allred's use of the words "prayer" and/or "amen", and/or had complained of Allred's expressed horror at a student's raised fist or at the imposition of discipline for raising the fist, and if the Board had done nothing about such complaints, there might be a colorable basis for arguing that the Board ratified or adopted Allred's and Harland's *modus operandi*. But, there is no such evidence. No school system can be expected to monitor the activities of each and every teacher and

8

principal to assure in advance that they meet all demands of the Constitution. In this case, Holloman is, after all, not alleging a failure by the Board to supervise or to properly train Allred or Harland. He could have travelled that road under *City of Canton v. Harris*, 489 U.S. 378, 109 S. Ct. 1197 (1989), that is, if he had thought he could prove the requisite facts for such an approach.

It must not only be kept in mind that Holloman is not complaining of a shortcoming by the Board in its training or supervision of Allred and Harland, but that he is not complaining of a denial of substantive due process or of procedural due process. Giving Holloman the benefit of the doubt, he complains of (1) interference with his claimed First Amendment right to freely express himself, and (2) interference with his claimed First Amendment right not to be exposed to religion in a governmentally sanctioned context. This court has already expressed its belief that Allred and Harland acted as reasonably prudent school officials when they interpreted Holloman's clenched fist as a defiantly disruptive gesture. Holloman has not attempted to give the court a rational explanation for his raised fist. At least his fellow student, Hutto, offered some rational explanation for his actions. What was Holloman's intended message? He obviously had one. It is difficult if not impossible to think of it as anything except an act of symbolic and vociferous objection to the pledge, or to some of the words in it. Whatever his purpose, his act

9

interfered to an impermissible degree with the free and voluntary participation in the pledge by Holloman's fellow students. At Allred's deposition, she testified, without contradiction, that while no student told her that Holloman's fist blocked his or her view of the flag during the pledge, "they said it bothered them". Of course, Holloman's fellow students might have been "bothered" by Holloman's sullen silence while they were trying to recite the Congressionally imprimatured words "under God" (see the Appendix), but there is a marked difference between simple silence and silence accompanied by a raised fist. Symbolic speech can become so "bothersome" at some point as to trespass upon the free speech rights of those who are "bothered". Allred said that she "had a lot of students come to me and say 'Ms. Allred, that's not right'" (referring to Holloman's raised fist and not to the punishment Holloman received for it).

Allred's and Harland's personal reactions to the fist episode could not have been pursuant to a Board policy, because there was no Board policy about raised fists, much less about fists raised while the pledge of allegiance was being said. The whole episode had an unnatural spontaneity to it. This court respectfully declines to instruct the Board hypothetically on what would be an appropriate policy or response under unique circumstances like these. This may never happen again.

Assuming *arguendo* that Holloman had some legitimately

debatable grievance or grievances against Allred and/or Harland, there was a procedure available for him. For aught appearing, that procedure was adequate for obtaining redress. To paraphrase *Scala v. City of Winter Park*, 116 F.3d 1396, 1402 (11th Cir. 1997):

> The [Board's] governing documents provide [students] with an opportunity for meaningful administrative review of [disciplinary] decisions [or other allegedly adverse treatment], and there is no evidence that the [Board] merely rubber-stamps the decision of [teachers or principals].

It is true that *Scala* does not establish an exhaustion requirement for §1983 claimants similar to the E.E.O.C. exhaustion requirement that Title VII establishes. See *Patsy v. Board of Regents of State of Florida*, 457 U.S. 496, 500, 102 S. Ct. 2557, 2560 (1982). But, the Board reserved unto itself the final authority to decide student grievances involving discipline. It adopted a written policy providing an avenue for a final appeal to it by Holloman. When Holloman did not avail himself of that procedure, neither a court nor a jury would have any way to determine what the Board would have done if Holloman had insisted on his "due process" hearing and had not, instead, accepted corporal punishment as a compromise resolution of his complaint. What Holloman did, in practical effect, constituted an accord and satisfaction or its functional equivalent. As noted *supra*, Holloman does not attack the Board's procedure, probably because he did not invoke it. If he had taken his various complaints to the Board, and had insisted on an expedited hearing in order to obtain a decision before his

11

graduation exercise, the Board, in theory, might have provided him with a happy result. Of course, theoretically, if the Board had denied him graduation and had told him that its decision was because Holloman had refused to recite the pledge, its action might have provided some proof of the existence of an unconstitutional policy. This did not happen.

For the foregoing separate and several reasons, the Board's motion for summary judgment will be granted, and Holloman's motion for summary judgment will be denied.

DONE this ___7th___ day of August, 2001.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

**MEMORANDUM OPINION AND STANDING RULE
FOR THE COURTROOM OF WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE FOR THE
NORTHERN DISTRICT OF ALABAMA**

As every lawyer and litigant knows, this court, and for that matter every federal court in the United States, is routinely opened by a court crier's intoning of the solemn words: "GOD SAVE THE UNITED STATES AND THIS HONORABLE COURT." During the relatively short period of constitutional history since this court graduated from law school in 1952, the federal courts have accelerated their interpretation of the Establishment Clause of the First Amendment to finally conclude that the simple invocation of God's blessing in a public school and in other public places is dangerously unconstitutional. *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261 (1962); *Jaffree v. Wallace*, 705 F.2d 1526, *rehearing denied* 713 F.2d 614 (11th Cir. 1983); *Wallace v. Jaffree*, 472 U.S. 38, 105 S.Ct. 2479 (1985).

The straw that broke this court's back is *Weisman v. Lee*, ___ F.2d _____, 59 LW 2095, 190 WL 101577 (1st Cir. July 23, 1990). This court is impressed both by Judge Bownes' concurrence and by Judge Campbell's dissent. As every lawyer knows, the Establishment Clause prohibits "laws respecting the establishment of religion." Judge Bownes correctly quotes Justice Stevens' in *County of Allegheny v. ACLU*, ___ U.S. ___, 109 S.Ct. 3086, 3130 (1989), as follows:

> "Respecting" means concerning or with reference to. But it also means with respect -- that is "reverence", "goodwill" ... Taking into account this richer meaning, the Establishment Clause, in banning laws that concern religion, especially prohibits those that pay homage to

1

religion.

*Id.* at ____.

In a wonderful retort with which this court would like to swim upstream, Judge Campbell says:

> What is there so religious about expressing thanks for diversity and for the protection of minority rights? By banning invocations, including those that mention a deity, we deprive people of an uplifting message that seems especially suitable for a rite of passage like a graduation.

*Id.* at ____.

When a court opens its doors to eager adversaries, everybody needs "an uplifting message," and a mentioning of the deity might be just the ticket.

From the date of investiture in 1982 until today, this court has been constantly embarrassed by its hypocrisy, and the hypocrisy of the other federal courts, in allowing ourselves, while standing imperiously above the crowded courtroom, to be publicly blessed while denying that privilege to little children in the public schools. Any serious jurist, who has integrity and would maintain the impenetrable wall of separation between the government and anything remotely religious, should be ashamed of himself for carrying in his pocket a coin bearing the ostensibly official belief that "In God We Trust," much less being publicly prayed over. Why the non-believing and secularly insistent public has not hollered out and litigated over this routine invocation of God's blessing upon judges charged with the solemn duty of enforcing the First Amendment is beyond this court's comprehension.

2

Could it be that those who want to extend the Establishment Clause to its logical but illogical conclusion don't want to offend their allies in this noble endeavor?

The `blessed courts have the gall to tell the school administrators that there can be no blessings in the schools, but don't have the guts to deny to the House and Senate their regular blessings. Perhaps Congress has exempted itself from the First Amendment as it has from all laws against employment discrimination.

This issue has been a particularly nagging one since this court wrote *United States v. Zumbado*, 650 F. Supp. 136 (N.D. Ala. 1986)[1], which graphically illustrated how a federal litigant is by

---

[1] During trial, there were several people in the audience who, after the conviction, have expressed to the court orally and in writing their belief that Zumbado had recently had a conversion experience and has become a Christian since his incarceration. Some of these people assert that as a result of his conversion Zumbado no longer poses a threat to society. During allocution today Zumbado, in effect, concurred in what his new Christian friends say about him in this regard.

During today's hearing, Zumbado chose again to invoke his privilege against self-incrimination rather than to challenge or to openly discuss the purported facts contained in the pre-sentence report. The initial response of the Government was that Zumbado had no privilege against self-incrimination during the sentencing phase because he is immune from prosecution as to anything he communicates to the court, or to its probation officer. After a recess, during which the court and the attorney for the Government found <u>United States v. Rodriguez</u>, 498 F.2d 302 (5th Cir. 1974), <u>Thomas v. United States</u>, 368 F.2d 941 (5th Cir. 1966), and <u>Estelle v. Smith</u>, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the Government conceded that the full protection of the Fifth Amendment is available to a defendant even during the penalty phase. In Zumbado's case the material in the pre-sentence report stands uncontradicted as a result of Zumbado's election to invoke the Fifth Amendment, a right which defendant clearly still possesses. The question not answered unequivocally by the decided cases is whether or not the <u>mere fact</u> that a defendant declines to cooperate with the Probation Service can be considered by the court in assessing the penalty.

Because the court has chosen to impose the maximum custodial sentence provided in the criminal statute here involved, and because Zumbado has already notified the court of his intent to appeal, the court reserved the right to write briefly an opinion elaborating its oral remarks.

If the court were not in any way influenced by Zumbado's invocation of the Fifth Amendment <u>per se</u>, there are abundant reasons reflected in the pre-sentence report, as well as in the conviction itself, for imposing the sentence which was imposed. The report demonstrates that Zumbado has an extensive criminal history, and the Probation Service's recommendation of the maximum custodial sentence was certainly justified without regard to Zumbado's non-cooperation. The question as to whether there is any limitation, except the maximum penalty provided by statute, as to what a trial judge can consider in deciding upon the appropriate penalty is a question which perhaps should be addressed. It would be easy for this court to disclaim any reliance whatsoever upon Zumbado's exercise of his Fifth Amendment privilege so as to obviate the present inquiry and to render the entire issue moot. However, this case is clearly distinguishable from <u>Thomas v. United States</u>, in which the Fifth Circuit held that the trial court abused its discretion by threatening the defendant with a more severe

3

the current practice either encouraged to invoke a God in whom he does not believe, or, if he is lukewarm, to be intimidated by a judge who seems to believe in God.

---

sentence if he did not "come clean and admit his guilt." In Zumbado's case the court did not in any way threaten Zumbado or attempt to induce him to waive his Fifth Amendment privilege. Yet, the mere fact that he invoked that privilege and refused to discuss his background, either personal or criminal, with the Probation Service or with the court, was a factor, however slight, in the court's sentencing decision, and the court willingly makes this a matter of record. The court would in all likelihood have imposed a two-year custodial sentence without regard to Zumbado's non-cooperation, but the court admits to having fed Zumbado's non-cooperation (or invocation of the Fifth Amendment) into the sentencing equation.

If there is any limitation upon the range of factors which a trial judge can consider in the penalty phase, it would seem that the religion or non-religion of the defendant is something which cannot or should not be considered. The First Amendment, as construed by the Supreme Court, precludes any pernicious entanglement between government and religion in any form or shape. If a school teacher cannot invoke God in the classroom, how can God be invoked in the courtroom? And yet, admittedly, this court is opened every day with the words, "God save the United States and this Honorable Court." A defendant doesn't realize that this intonement is no more than a quaint piece of nostalgia, an innocuous vestige from a bygone era when there was an official acknowledgement of the existence of God. Without such an understanding, when a defendant hears these words it is no wonder that he is tempted to invoke the God he heard formally invoked by the court, and he even may be tempted to invoke the particular brand of religion or the kind of God personally espoused by the sentencing judge, that is, if the sentencing judge espouses any. Put another way, should the severity or leniency of a sentence be influenced either by the judge's religious preferences or by a profession of faith by the person who stands before him convicted? Predictably there may be disparity in the sentences imposed if the trial court's discretion can be based in any degree upon his own religion or upon the religion of the defendant, so not only is the constitutional mandate of separation of church from state possibly implicated here, but the equal protection clause of the Fifth Amendment may also be implicated. For instance, what would be the reaction of a Jewish judge or an atheist judge or a Muslim judge to the communications which this court has been receiving on behalf of Zumbado? Is it fair, or right, or constitutional, for a judge who happens to be a professing Christian to permit himself to be influenced in sentencing by his own theology or the theology of the defendant, whether the theologies are the same or different? Of course, it is extremely difficult to separate the human mind into compartments, even the judicial mind, and it is impossible, as a practical matter, to say with confidence what influences or fails to influence any particular mental operation including that of this court.

Perhaps under the Comprehensive Crime Control Act and its prospective sentencing criteria, which will supposedly become effective on November 1, 1987, federal judges will be sufficiently relieved of sentencing discretion so that they will not be tempted to accept or to reject or to be influenced by a defendant's claim that he has been converted. That, however, takes place on November 1, 1987, if the criteria can be agreed upon within the mandated time period, and this is December 29, 1986.

Because this court has decided that it cannot consider any religious factor in sentencing, the court does not have to decide upon the validity or the <u>bona fides</u> of Zumbado's conversion experience or its long-term effect on Zumbado's relationships with his fellow human beings.

As dictum the court refers to a book alleged to describe historical events. It is sometimes called The Bible. It tells of a man named Saul who had a conversion experience on the road to Damascus. More than one federal judge could say with some authority that more people claim a conversion experience on the road to the Big House than on the road to Damascus. Such a cynical comment is uncalled for when no inquiry into "conversion" is permitted. The court will point out, however, that this history book further maintains that Saul, as Paul, was quite a successful Christian while in jail, perhaps more successful than while he was free.

On the basis of the materials presented at the pre-sentence hearing this date and on the basis of this opinion, the sentence imposed by the court is RATIFIED and CONFIRMED in all respects.

*Id.* at 136-138.

4

This court is hesitant to admit in a written opinion its personal belief in God, but it does anyway. This court will continue privately to ask God's blessings on this court and on all other courts, recognizing that the courts need all the help they can get, divine or otherwise. But this court forthwith ORDERS the discontinuance of the cruelly ironic and hypocritical official invocation of the Deity in its courtroom in any federal courthouse within the Northern District of Alabama. The day for this court to admit an inexcusable inconsistency in First Amendment jurisprudence is today. The awful and obvious chink in the wall of separation must be plugged, at least in this court's courtroom.

Accordingly, the standing procedure in this particular court for introducing the litigants and their counsel to the court as the court opens shall no longer be: "God Save The United States And This Honorable Court!" Neither shall it be: "Here Comes De Judge!" Instead, it shall be the simple and dignified:

> "Everyone rise. The United States District Court for the Northern District of Alabama is now in session, Honorable William M. Acker, Jr., presiding. Let those who have business with the court now make their business known. Be seated, please."

The Clerk is ORDERED to deliver a copy of this opinion and standing rule to all courtroom deputies in the Northern District of Alabama, and to mail copies to the Birmingham Bar Association, the Alabama Bar Association, the American Bar Association, the American Civil Liberties Union, the Judicial Conference of the United States, the Administrative Office of the United States, and

5

the Supreme Court of the United States.

This ORDER shall remain in effect only for the court of William M. Acker, Jr., until such time as the Court of Appeals for the Eleventh Circuit or the Supreme Court orders otherwise.

DONE this _22nd_ day of August, 1990.

                                                _/s/ William M. Acker_
                                              WILLIAM M. ACKER, JR.
                                              UNITED STATES DISTRICT JUDGE